FILED
ASHEVILLE, N.C.

SEP 1 2011

U.S. DISTRICT COURT
W. DIST. OF N.C.

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | **CIVIL ACTION NO. 3:11-cv-0141** |
| THE STATE OF COLORADO, | ) | |
| THE STATE OF GEORGIA, | ) | |
| THE STATE OF NORTH CAROLINA, | ) | **CASE UNDER SEAL PURSUANT** |
| THE STATE OF TEXAS, and | ) | **TO MARCH 25, 2011 ORDER** |
| THE COMMONWEALTH OF VIRGINIA, | ) | |
| *EX REL.* ANTONIO SAIDIANI, | ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| Plaintiffs, | ) | **DO NOT ENTER ON PACER** |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| NEXTCARE, INC., | ) | |
| NEXTCARE ARIZONA LLC, | ) | |
| COLORADO URGENT CARE, LLC, | ) | |
| NEXTCARE GEORGIA LLC, | ) | |
| NEXTCARE NORTH CAROLINA LLC, | ) | |
| MATRIX OCCUPATIONAL HEALTH, INC., | ) | |
| NEXTCARE TEXAS LLC, | ) | |
| VIRGINIA URGENT CARE, LLC, | ) | |
| JOHN SHUFELDT, and | ) | |
| DOES 1 THROUGH 25, INCLUSIVE, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT PURSUANT TO
THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *ET SEQ*.
AND PENDENT STATE FALSE CLAIMS ACTS**

# TABLE OF CONTENTS

I. JURISDICTION AND VENUE ........................................................................... 1

II. THE PARTIES ................................................................................................. 2

III. THE FEDERAL AND STATE FALSE CLAIMS ACTS ................................. 7

IV. ONLY "MEDICALLY NECESSARY" SERVICES ARE REIMBURSABLE ............... 8

V. NEXTCARE BILLED FOR MEDICALLY UNNECESSARY ALLERGY, SPIROMETRY, AND DIATHERIX RESPIRATORY INFECTIONS PANEL/H1N1 TESTS ..................................................................................................................... 9

    A. Medically Unnecessary Allergy Tests ........................................................ 10

    B. Medically Unnecessary Spirometry Tests For (Alleged) Allergy Patients ................. 27

    C. Medically Unnecessary Diatherix Respiratory Infections Panel/H1N1 Tests .............. 29

VI. COUNTS ........................................................................................................ 36

VII. REQUESTS FOR RELIEF ............................................................................ 54

VIII. DEMAND FOR JURY TRIAL ..................................................................... 55

Plaintiff Antonio Saidiani ("Relator") brings this action on behalf of the United States of America, the State of Colorado, the State of Georgia, the State of North Carolina, the State of Texas, and the Commonwealth of Virginia (hereinafter collectively referred to as "Plaintiff States"), against NextCare, Inc., NextCare Arizona LLC, Colorado Urgent Care, LLC, NextCare Georgia LLC, NextCare North Carolina LLC, Matrix Occupational Health, Inc., NextCare Texas LLC, Virginia Urgent Care, LLC, John Shufeldt, and Does 1 through 25, inclusive (hereinafter collectively referred to as "Defendants" or "NextCare") for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, the Colorado Medicaid False Claims Act, C.R.S. 25.5-4-304 *et seq.*, the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*, the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*, the Texas False Claims Act, Tex. Hum. Res. Code §§ 36.001 *et seq.*, and the Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.* (hereinafter collectively referred to as the "State False Claims Acts" or "State FCAs") to recover all damages, civil penalties and all other recoveries provided for under the FCA and State FCAs. As described more fully below, NextCare knowingly defrauded the United States as well as the State of Colorado, State of Georgia, State of North Carolina, State of Texas, and Commonwealth of Virginia by billing and obtaining reimbursement from the Federal and States' healthcare programs for thousands of medically unnecessary allergy, spirometry, and Diatherix Respiratory Infections Panel/H1N1 tests NextCare systematically performed from around May 2009 through at least April 2010.

## I. **JURISDICTION AND VENUE**

1. Jurisdiction is founded upon the FCA, 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331 and 1345.

2. Venue is proper in the Western District of North Carolina under 31 U.S.C. §

3732(a) and (b) and 28 U.S.C. § 1391(b) and (c).

## II. **THE PARTIES**

3.    The United States is a plaintiff to this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded healthcare programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

4.    Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease. See 42 U.S.C. §§ 426 and 426A. Medicare Part B provides outpatient medical care coverage to qualified beneficiaries. CMS, which is part of HHS, administers Medicare.

5.    TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. See 32 C.F.R. § 19 *et seq.*

6.    The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

7.    Medicaid is a government health insurance program funded jointly by the Federal and State governments. See 42 U.S.C. § 1396 *et seq.* Each State administers its own Medicaid program. However, each State program is governed by Federal statutes, regulations and guidelines. The federal portion of each State's Medicaid payment – the Federal Medical Assistance Percentage – is based on that State's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage was between approximately 50% and 80%.

8.    Throughout the relevant time period, the services specified herein were provided to Medicaid beneficiaries in the State of Arizona, State of Colorado, State of Georgia, State of

North Carolina, State of Texas, and the Commonwealth of Virginia.

9.     Throughout the relevant time period, the services described herein were provided to beneficiaries of Medicare, Medicaid, TRICARE, the Veterans Administration, and other federally funded healthcare programs (collectively referred to herein as "Government Payers").

10.     Relator Antonio Saidiani is a citizen of the United States and resident of Arizona. From November 2008 through April 2010, Relator was employed by NextCare, Inc. as an Area Operations Manager responsible for oversight of eight NextCare Urgent Care clinics located in Arizona and also performed the duties of Clinic Manager for three of those clinics. The allegations in this Complaint are based upon information Relator discovered through his work at NextCare and through his own personal efforts, observations, and investigation.

11.     Defendant NextCare, Inc. is a Delaware corporation with its principal place of business at 2550 North Thunderbird Circle, Suite 303, Mesa, Arizona 85215. NextCare, Inc. owns, manages, operates, and controls more than 50 walk-in medical clinics located in Arizona, Colorado, Georgia, North Carolina, Texas, and Virginia doing business under the name NextCare Urgent Care. NextCare, Inc. also owns, manages, operates, and controls defendants NextCare Arizona LLC, Colorado Urgent Care, LLC, NextCare Georgia LLC, NextCare North Carolina LLC, Matrix Occupational Health, Inc., NextCare Texas LLC, and Virginia Urgent Care, LLC, and Does 1 through 25, inclusive, which it established to serve as holding companies for NextCare Urgent Care clinics. Additionally, NextCare, Inc. also owned, managed, operated, and controlled the following inactive limited liability companies, which prior to their merger into NextCare Arizona LLC owned and operated various NextCare Urgent Care clinics in Arizona during the relevant time period: Apache Junction Urgent Care, LLC, Avondale Urgent Care, LLC, Casa Grande Urgent Care, LLC, Chandler Urgent Care, LLC, Dana Landing Urgent Care,

LLC, Desert Ridge Urgent Care, LLC, Glendale Urgent Care, LLC, Greenway Urgent Care, LLC, Shea Urgent Care, LLC, Southwest Phoenix Urgent Care, LLC, Sun City Urgent Care, LLC, and Thomas Road Urgent Care, LLC.

12. Defendant NextCare Arizona LLC, which does business under the name NextCare Urgent Care, is a Delaware limited liability company with its principal place of business at 2550 North Thunderbird Circle, Suite 303, Mesa, Arizona 85215. During the relevant time period NextCare Arizona LLC owned and operated several walk-in medical clinics in Arizona that treat non-life threatening injuries and illnesses and provide physical examinations along with other basic medical services. On information and belief, several NextCare Urgent Care clinics located in Arizona were owned and operated during the relevant time period by limited liability companies owned, managed, operated, and controlled by defendants NextCare, Inc. and John Shufeldt, including, but not limited to, Apache Junction Urgent Care, LLC, Avondale Urgent Care, LLC, Casa Grande Urgent Care, LLC, Chandler Urgent Care, LLC, Dana Landing Urgent Care, LLC, Desert Ridge Urgent Care, LLC, Glendale Urgent Care, LLC, Greenway Urgent Care, LLC, Shea Urgent Care, LLC, Southwest Phoenix Urgent Care, LLC, Sun City Urgent Care, LLC, and Thomas Road Urgent Care, LLC. According to the Arizona Corporate Commission, all of these LLCs merged into NextCare Arizona LLC on February 28, 2011 and as a result no longer exist.

13. Defendant Colorado Urgent Care, LLC, which does business under the name NextCare Urgent Care, is a Colorado limited liability company with its principal place of business at 2550 North Thunderbird Circle, Suite 303, Mesa, Arizona 85215. During the relevant time period Colorado Urgent Care, LLC owned and operated six walk-in medical clinics in Colorado that treat non-life threatening injuries and illnesses and provide physical examinations

along with other basic medical services.

14.     Defendant NextCare Georgia LLC, which does business under the name NextCare Urgent Care, is a Delaware limited liability company with its principal place of business at 2550 North Thunderbird Circle, Suite 303, Mesa, Arizona 85215. During the relevant time period NextCare Georgia LLC owned and operated at least one walk-in medical clinic in Georgia that treated non-life threatening injuries and illnesses and provided physical examinations along with other basic medical services.

15.     Defendant NextCare North Carolina LLC, which does business under the name NextCare Urgent Care, is a Delaware limited liability company with its principal place of business at 2550 North Thunderbird Circle, Suite 303, Mesa, Arizona 85215. During the relevant time period NextCare North Carolina LLC owned and operated several walk-in medical clinics in North Carolina that treat non-life threatening injuries and illnesses and provide physical examinations along with other basic medical services.

16.     Defendant Matrix Occupational Health, Inc., which does business under the name NextCare Urgent Care, is Delaware corporation with its principal place of business at 2550 North Thunderbird Circle, Suite 303, Mesa, Arizona 85215. Defendants NextCare, Inc. and John Shufeldt owned, managed, operated, and controlled Matrix Occupational Health, Inc., which owned and operated certain NextCare Urgent Care clinics in North Carolina during the relevant time period.

17.     Defendant NextCare Texas LLC, which does business under the name NextCare Urgent Care, is a Delaware limited liability company with its principal place of business at 2550 North Thunderbird Circle, Suite 303, Mesa, Arizona 85215. During the relevant time period NextCare Texas LLC owned and operated four walk-in medical clinics in Texas that treat non-

5

life threatening injuries and illnesses and provide physical examinations along with other basic medical services.

18. Defendant Virginia Urgent Care, LLC, which does business under the name NextCare Urgent Care, is a Virginia limited liability company with its principal place of business at 2550 North Thunderbird Circle, Suite 303, Mesa, Arizona 85215. During the relevant time period Virginia Urgent Care, LLC owned and operated three walk-in medical clinics in Virginia that treat non-life threatening injuries and illnesses and provide physical examinations along with other basic medical services.

19. Defendant John Shufeldt ("Shufeldt") is an attorney and licensed physician who throughout the relevant time period served as NextCare, Inc.'s Chief Executive Officer as well as Chairman of its Board of Directors. He resigned as CEO in June 2010. Shufeldt founded NextCare's predecessor, Pinnacle Medicine, Inc., in 1993. He resides in Arizona.

20. In view of NextCare, Inc.'s apparent practice of establishing entities to hold ownership of its clinics, there may be other entities that own and operate NextCare Urgent Care clinics. Because Relator is unaware of the true names and capacities of these entities, he consequently sues them under the fictitious names "Does 1 through 25, inclusive" (hereinafter referred to as the "Doe Defendants"). Relator will amend this Complaint to allege the Doe Defendants' true names and capacities when ascertained. Additionally, Relator will exercise due diligence to determine Doe Defendants' true names, capacities and contact information, and to effect service upon those Doe Defendants.

21. The management, supervision, control, reporting, and financial exchanges by and between NextCare, Inc., NextCare Arizona LLC, Colorado Urgent Care, LLC, NextCare Georgia LLC, NextCare North Carolina LLC, Matrix Occupational Health, Inc., NextCare Texas LLC,

6

Virginia Urgent Care, LLC, John Shufeldt, Doe Defendants, and the various NextCare Urgent Care clinics have been so inextricably intertwined that in effect they have operated as one single entity. They acted in concert together to foster, facilitate, and promote the unlawful conduct alleged herein.

### III. THE FEDERAL AND STATE FALSE CLAIMS ACTS

22.     The Federal False Claims Act ("FCA") provides, among other things, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

23.     The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

24.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded ...." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

25.    "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

26.    Each of the Plaintiff States has individually enacted False Claims Acts modeled after the FCA that contain provisions similar to those quoted above. Relator asserts claims under the State FCAs to recover for the Plaintiff States the amounts they provided Defendants in payment of the false claims presented to the States' Medicaid programs alleged herein.

## IV. ONLY "MEDICALLY NECESSARY" SERVICES ARE REIMBURSABLE

27.    Services provided to Medicare and other federal healthcare program beneficiaries are only reimbursable if they are medically necessary. See 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1); Medicare Carrier's Manual § 2049. That is, Medicare and other federal healthcare programs only cover medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." Id.

28.    Accordingly, providers may only submit claims for Medicare reimbursement for "reasonable and necessary" medical services. And, in submitting claims, providers make certain express certifications, including an assurance that the services were "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1); see also 42 U.S.C. § 1395n(a)(2)(B) (to receive payment for claims providers must certify that services were "medically required"). Moreover, in submitting reimbursement claim form CMS-1500 to obtain reimbursement from Medicare or other Federal healthcare programs, providers expressly certify "that the services shown on [the] form were medically indicated and necessary for the health of the patient." Thus, each time a claim for payment is submitted to Medicare, the provider expressly certifies that the services performed were medically justified. In addition, each time a provider submits a claim, the provider impliedly certifies that the service was provided in

8

accordance with Federal and State statutes, regulations, and program rules. Knowingly causing the submission of claims that are ineligible for payment under a federal healthcare program constitutes a violation of the FCA. See U.S. ex. rel. Franklin v. Parke-Davis, 147 F. Supp. 147, 152-153 (D. Mass. 2001)(knowingly causing the submission of claims that are ineligible for reimbursement can serve as a basis for liability under the FCA); see also U.S. ex rel. Nowak v. Medtronic, Inc., Case Nos. 1:08-cv-10368 and 09-cv-11625 (D. Mass.)(United States' Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program ... because the program places other conditions on coverage that are not satisfied, the claim is false").

29.     Similarly, a claim for "worthless" medical care violates the FCA because the government believes it is paying for services or items that have medical value when, in fact, the services or items are essentially worthless. See Mikes v. Straus, 274 F.3d 687, 702-4 (2d Cir. 2001); U.S. v. SmithKline Beecham, Inc., 245 F.3d 1048, 1053 (9th Cir. 2001).

### V. NEXTCARE BILLED FOR MEDICALLY UNNECESSARY ALLERGY, SPIROMETRY, AND DIATHERIX RESPIRATORY INFECTIONS PANEL/H1N1 TESTS

30.     In 2008 and early 2009, NextCare was struggling financially. In fact, finances were so tight, there were months when NextCare held back employee pay checks so as to avoid breaching a loan covenant that required the company to have at least $5 million in its operating account.

31.     Starting in the Spring of 2009, NextCare launched a series of corporate-wide testing initiatives aimed at generating more revenue. These testing initiatives, which lasted until at least April 2010 (when Relator's employment ended), included:

(a)     Recommending allergy tests to all patients regardless of the condition that brought them to NextCare's clinics;

(b)  Performing spirometry tests before every allergy test; and

(c)  Performing Diatherix Respiratory Infections Panel/H1N1 tests on all patients with cold or flu-like symptoms.

32.  A significant percentage of these tests were performed on patients whose medical expenses were paid for by Medicare and other Government Payers.

33.  Despite knowing that the allergy, spirometry, and Diatherix Respiratory Infections Panel/H1N1 tests were not medically necessary, Defendants sought and obtained reimbursement for the tests from Medicare and other Government Payers. On information and belief, Defendants defrauded the United States and Plaintiff States of tens of millions of dollars through these false claims.

### A.  Medically Unnecessary Allergy Tests

34.  The treatment of allergies is a specialized area of medicine normally undertaken by highly-trained allergists.

35.  The standard of care for treating allergies involves a step-by-step approach designed to treat the condition in the least invasive manner.

36.  Allergists first ask detailed questions about a patient's medical history, signs and symptoms, and the patient's usual way of treating their symptoms. Answers to these questions help the physician determine whether an allergy runs in the patient's family, whether they might have that allergy, and the available treatment options.

37.  The second step is for allergists to perform a physical examination to search for additional clues about the causes of the patient's signs and symptoms.

38.  If the patient's medical history and physical examination provide sufficient information for the allergist to make a diagnosis and devise a treatment plan, there is no medical need for an allergy skin test.

39.    Likewise, when certain allergy medicines, such as Claritin, will relieve the patient's symptoms, an allergist is likely to advise against allergy testing.

40.    However, if after conducting a detailed history and physical exam an allergist is uncertain about the cause of allergy symptoms or the patient has significant symptoms for which allergy medicine does not provide relief, they may recommend testing. Together with a patient medical history and physical exam, skin tests can help confirm whether signs and symptoms, such as sneezing, wheezing and skin rashes, are caused by allergies. Skin tests can also help identify the specific substances that trigger allergic reactions so as to enable the development of a treatment plan that may include avoidance, medication, or allergy shots (immunotherapy).

41.    Even when testing is justified, an allergist may nevertheless advise against it if: (1) the patient is taking medications, such as antihistamines, antidepressants, or heartburn medications that interfere with test results, or (2) the physician believes there is a possibility the patient may be so sensitive to certain substances that even the small amounts of them used in skin tests could trigger a severe or potentially fatal allergic reaction (anaphylaxis). Also, where the only alternative treatment to a suspected allergy would be desensitization shots and the patient indicates a reluctance to commence such therapy, the allergist may conclude that pinpointing the allergy through testing would provide no benefit because the patient is unwilling to undergo the subsequently recommended treatment.

42.    During an allergy skin test, the patient's skin is exposed to allergy-causing substances (allergens). Approximately 15 minutes after allergens are introduced to the skin an allergist will examine the exposed areas for signs of a local allergic reaction.

43.    With regard to skin testing, the Joint Task Force on Practice Parameters[1] provides

---

[1] The Joint Task Force on Practice Parameters, which is comprised of three societies (the American Academy of Allergy, Asthma, and Immunology, the American College of Allergy, Asthma, and Immunology, and the Joint

the following guidance:

- The number of skin tests and the allergens selected for skin testing should be determined based on the patient's age, history, environment and living conditions (e.g., region of the country), occupation, and activities. Routine use of large numbers of skin tests without a definite clinical indication are clearly not justified.

- For an individual patient, the choice of allergens for testing should be guided primarily by the patient's history and physical examination and will reflect the physician's knowledge, training, and experience. Indiscriminate testing is inconvenient to patients and office staff and is an unwise use of healthcare resources.

Allergy Diagnostic Testing: An Updated Practice Parameter, Annals of Allergy, Asthma & Immunology, Vol. 100 (2008) at Summary Statements 43 and 67.

44.     Based on the recognized practices described in the preceding paragraphs, for an allergy test to be medically necessary the following prerequisites should be satisfied:

- The patient presents clinically significant allergy symptoms;
- The physician has obtained additional information about the causes of the patient's symptoms through a detailed medical history and physical exam; and
- The physician has concluded that allergy medicine will not relieve the patient's symptoms.

And, if all factors are met and testing is deemed appropriate, the testing should be focused on the allergen that the provider suspects may be causing the uncontrollable allergy symptoms.

45.     Without any regard for these accepted practices, in or around May 2009, NextCare began an allergy test initiative under which *all of its clinics* recommended allergy testing to *every person* (including babies, children and elderly patients) that visited its clinics. Notably, this initiative was not a response to patient medical need but rather spawned from an

---

Council of Allergy, Asthma, and Immunology) representing an estimated 95% of the allergist/immunologists practicing in the United States, develops standards for the diagnosis and treatment of allergies that embody generally accepted practices within the profession. HHS has recognized that the standards developed by the Joint Task Force qualify as "professionally recognized standards of health care" for purposes of 42 U.S.C. § 1320c-5(a)(2). See Allergen Immunotherapy for Medicare Beneficiaries, Feb. 2006, Office of Inspector General, HHS at 4.

idea for how to generate desperately needed revenue that NextCare executive, Jenn Robb, presented to the company's then CEO, defendant Shufeldt.

46.     Looking for ways to keep his company afloat, Shufeldt, at Robb's suggestion, engaged Jeffrey Lime and his company, Advanced Allergy Consulting Group, LLC ("AACG"), to implement allergy testing at all of NextCare's clinics. Thereafter, Lime introduced NextCare employees to allergy testing with a 45-minute webcast, then, often accompanied by Robb, he conducted two-hour training sessions at each NextCare clinic.

47.     As evidenced by his May 29, 2009 email to senior management quoted below, Shufeldt viewed allergy testing as a potential cure for NextCare's financial woes:

> I cannot stress enough how important this program is [to] our financial well-being. To date, we have missed volume and missed revenue per patient; the proverbial double whammy of failures. The successful implementation of this initiative could literally be our saving factor, which might allow us to come close to our 2009 budget. I can assure you "the dew is off the rose" with our investors who are no longer tolerant of excuses. This program needs to be implemented quickly and without misstep. Every day that goes by without the possibility of the favorable revenue increase this program offers is a day we have to make up before the end of the year....

48.     The following facts, which are discussed more fully below, demonstrate that the allergy tests NextCare performed and billed Medicare and other Government Payers for were not medically necessary:

- Although patients did not present clinically significant allergy symptoms, under a corporate standing order, they were nevertheless solicited and administered allergy tests.
- Even assuming arguendo that the tested patients had presented significant allergy symptoms:
  - NextCare's providers did not seek to illicit additional information about the causes of the patient's symptoms through a detailed medical history and physical exam before the allergy tests were performed. In fact, NextCare had a standing order directing medical assistants to solicit and perform the tests before the provider even saw the patients.
  - NextCare did not first try to treat the symptoms with allergy medicine.
  - NextCare did not customize each test based on the individual's profile; rather, it

tested every patient for hypersensitivity to the same 60 allergens.

- ○ NextCare tested patients even though they were taking other medications that could alter the results.
- ○ NextCare recommended the same course of treatment to all patients whom they determined had an allergy – *i.e.*, immunotherapy drops not approved by the U.S. Food and Drug Administration (FDA).

49. NextCare published corporate "standing orders" that were sent to all clinics. For example, there was a standing order mandating clinics, upon completion of their two-hour training session, to start soliciting allergy testing to every patient that walked through the door.[2]

50. Under the standing order, when a patient visited a NextCare clinic, the medical assistants who took the patients' information were directed to recommend the allergy tests to patients while interviewing them about the reason for the visit. Through these standing orders, NextCare effectively placed judgments regarding medical necessity in the hands of medical assistants and office clerks, as opposed to medical providers.

51. For patients displaying or reporting a runny nose, congestion, shortness of breath, itchy eyes or rash, the medical assistants were trained to recommend to the patient that they could receive a test that would confirm whether their condition was caused by an allergy. And for patients that did not present a runny nose, congestion, shortness of breath, itchy eyes, or rash, medical assistants, in accordance with NextCare's directive, asked the patient if they ever experienced any of these symptoms in the past and, when the patient replied they had, the medical assistants would then suggest that the patient should undergo a test to determine whether they have an allergy.

52. While interviewing patients, medical assistants entered the patient's information onto an electronic medical record. To ensure allergy testing was recommended to all patients,

---

[2] Standing orders, by definition, do not relate to providing individualized medical care. Rather, standing orders are issued for universal issues, such as procedures to follow in the event of an emergency. Tests performed pursuant to a standing order, like the allergy tests here, are *a fortiori* medically unnecessary.

14

NextCare configured its computer system to automatically prompt medical assistants to recommend an allergy test when patients reported ever having a runny nose, congestion, shortness of breath, itchy eyes or a rash.

53. The "Provider Fact Sheet," in which NextCare summarized the allergy testing initiative shows that NextCare misinformed its employees about when allergy testing is appropriate. More particularly, the "Fact Sheet" stated:

- The allergy testing program is a patient as well as a business initiative.
- Per the American Academy of Allergy and Immunology, any patient who suffers from allergy type symptoms should be tested and the preferred method is the skin testing that we are already doing.
- The first component of treatment for allergies is avoidance of what you are allergic to and the only way to know that is to be tested.
- If the staff has spoken to the patient about allergy testing and the patient wants to proceed, the only reason to cancel that testing would be if there is a serious medical contraindication to the testing.
- If patients are too sick to be tested in clinic at their visit, then offer them the option to return when they are feeling better to get the testing done.

54. To induce patients to consent to the tests, NextCare told patients their insurance would fully-cover the cost of the test and/or it waived or significantly discounted co-pays.

55. If a patient accepted the medical assistant's allergy test solicitation, the medical assistant, without consulting the provider, performed the tests. Hence, patients often received the allergy test before they were seen by a qualified healthcare provider – *i.e.*, a physician, physician's assistant, or nurse practitioner. NextCare directed medical assistants to perform the tests to keep the time providers spent with each patient to a minimum, which in turn enabled providers to see more patients while reducing patient wait times.

56. If a patient did not agree to testing during the medical assistant interview, providers were required by NextCare policy to recommend the test again when they subsequently saw the patient.

15

57.     Every patient that consented to an "allergy test" received 62 separate skin tests. More particularly, NextCare tested for hypersensitivity to 60 common trees, weeds, molds, fungi, and animals by using a ten-pronged device to introduce ten antigens at a time to different areas of the back. In addition, NextCare administered two control tests − a histamine test and saline test − to each patient using a single-pronged device.

58.     None of the testing was done pursuant to an individualized plan of care. To the contrary, every patient got the same battery of tests, regardless of the patient's past or present health status and regardless of whether the allergen existed in the environment in which the patient lived or worked. NextCare's universal testing runs counter to well-recognized professional standards. What's more, in performing allergy testing, NextCare used a shotgun approach rather than pinpointed approach, which is the standard of care.

59.     Testers documented their findings from the 62 skin tests in patients' electronic medical record. When a NextCare provider later met with the patient, the test was approved and the results were reviewed. If a patient was determined to have a positive reaction to an allergen, the provider also reviewed treatment options with the patient.

60.     NextCare had a second standing order, one which *required* providers to recommend sublingual immunotherapy (SLIT) to all patients who had a positive reaction to any of the 60 allergens. The sublingual immunotherapy prescribed by NextCare involved the daily placing of drops of allergen extract under the tongue for a period of years with the objective being to cause the immune system to build a tolerance to the allergen over time. Disturbingly, this form of allergy therapy that NextCare was soliciting has not been approved by the FDA.

61.     Because there is a risk of an anaphylactic reaction to the allergen drops and the drops are taken outside the supervision of a medical provider, each patient was also prescribed an epinephrine injection ("epi-pen") for use in the event of a life-threatening reaction.

62. Notably, NextCare compensated AACG for the allergy consulting services it provided by buying all its allergy testing kits from AACG and prescribing the SLIT drops to patients, which benefitted AACG because it received a commission from the manufacturer for each bottle NextCare sold.

63. NextCare wanted clinics to perform as many of the $620 allergy tests as possible. To force compliance with the standing order to solicit allergy testing to every patient, it set daily allergy test quotas for every clinic. NextCare circulated a report called Allergy Testing Results that set forth each clinic's daily and monthly quotas and reported how many allergy tests each clinic performed. According to the August 2009 Allergy Testing Results report, the goal for that month was for 4,960 allergy tests company-wide. That report also shows that as of August 17, 2009, the clinics had performed over 1,110 allergy tests. According to another Allergy Testing Results report, NextCare performed 2,050 allergy tests in November 2009.

64. Defendant Shufeldt exerted significant pressure on clinic managers to ensure their clinics met the quotas. For example, job security, lifting of salary freezes, and bonuses were tied to satisfying allergy test quotas. In fact, Shufeldt threatened that managers whose clinics did not meet the allergy testing quotas would be fired, as would any provider who objected or refused to participate in the allergy testing initiative. The pressure Shufeldt exerted is demonstrated in the following three emails he sent to NextCare's clinic managers:

#### July 6, 2009 Email

Starting this Friday my expectation is:

1. **Each market trained on allergy testing and treatment, on average, must do at least 5 allergy tests per clinic, per day. Example: 6 clinics in a market equals 30 tests per day. Obviously, a clinic seeing 40 pts per day should be doing twice as many as a clinic seeing 20 patient per day.**
2. We perform spirometry as opposed to peak flow on all patients for which it is indicated.
3. All Occ med patients' meds are dispensed in-house (except in Texas).

17

4. **Standing order compliance is maximized.**
5. Dispensed medication utilization is maximized.

Beginning Friday, **you are strictly accountable for these goals** so I need to know immediately if you have any barriers, which would impede your success. **The accomplishment of these goals are integral to our future; consequently, I will be looking at reports 7 days a week. When we accomplish these goals, we can enjoy:**

1. **Continued expansion at a renewed rapid pace,**
2. **Lifting of the hiring and wage freeze,**
3. **Job security, collectively and individually,**
4. **Return of the 401K matching,**
5. **Better eventual valuation,**
6. **Bonuses; and most importantly,**
7. Pride in accomplishing what no other urgent care leaders have ever accomplished.

I am counting on you to exceed these goals inasmuch as I have no doubt in your ability to lead and champion change!

Raise the Bar / Push the Envelope,
John

(Emphasis added).


## July 13, 2009 Email

Congratulations on some success in the allergy program. Although this is gaining some traction, we are well short of our goal. **Recall the goal:**

- **On average, 5 tests/treatments per clinic, per market, per day.**

Unfortunately, we do not have the luxury of time to slowly roll this out. Please remember, I am here to offer help, support in any way necessary. The challenge is that we have to have nearly immediate results. Congratulations to Texas, I understand you just completed training over the weekend.

Clinic Managers: by Tuesday evening, **please send me a brief written game plan to improve these numbers for your clinic(s).**

Medical Directors: please send me your game plan to work with the providers by Tuesday evening. **The message from the providers should be something like this: "You have signs and symptoms that are often caused by allergies. We are going to do a very simple skin test to try and determine to what you are allergic. If in fact you are allergic to one of the things we test for, we have**

drops that go under your tongue which, over time, makes you much less susceptible to allergies." Looking at the data thus far, it is very clear that success is dependent upon the message.

Please do not hesitate to call or contact me with questions. Thanks for your support and perseverance!

Raise the Bar / Push the Envelope,
John

(Emphasis added).

## August 4, 2009 Email

As you know, **every manager in the country received an email from me, which included the number of allergy tests their clinic has completed to date along with my expectations of what they should be doing based upon their visit volume and payer mix. My email also included a "carrot" which was the manager's ability to order food on every day the clinic meets or exceeds their goal. What I left out and what I want to make sure the managers understand is that their failure to succeed will be grounds for their dismissal.**

Somewhat surprisingly, I received a number of emails from the managers, the gist or which can be summarized this way, "I did not know I had a goal so now that I know, I will strive to achieve it" or "Gee, I will try but don't hold your breath."

These responses from some (a minority) of the managers tells me a few things:

1. Some do not read the daily emails I send out which review the previous day's numbers and expectations.
2. Some do not realize the urgency of this matter.
3. Some do not know that the success of this initiative is dependent upon their ability to influence change via their leadership.

Finally, that some of them are not realizing the benefit of your leadership; or, in other words, you are not affecting change.
This has to be a team effort. With the help of Dr. Resnick and the regional medical directors, **I can assure you that the providers will either be on-board or out.** Only one manager has replied that a provider is the rate-limiting factor, thus for every other clinic, the manager should have the ability to influence change.

Please reach out to all of your direct reports to ensure they received and understand the email. Time is of the essence so these discussions should happen within the next 48 hours. If you have any questions, thoughts, or concerns, please do not hesitate to call me directly. Thanks!

Raise the Bar / Push the Envelope,
John

(Emphasis added).

65.    To pressure and incentivize providers to increase patient revenue, NextCare internally published monthly "Provider Scorecards" ranking all providers according to, among other metrics, their average gross charge-per-patient, the number of prescriptions they wrote, and the number of patients they saw per hour. Part of providers' compensation was in the form of monthly bonuses that were based on the Provider Scorecards. And since performing more allergy tests would positively impact providers' gross charge-per-patient ranking, NextCare effectively made it financially rewarding for providers to engage in medically unnecessary procedures, including allergy testing as well as the spirometry and Respiratory Infections Panel/H1N1 testing discussed below. On the other hand, providers who had a low gross charge-per-patient and did not inflate their numbers through unnecessary testing received smaller bonuses (or no bonus at all) and, in some cases, were terminated.

66.    The first page of the May 2009 Provider Scorecard showing the gross charge-per-patient rankings is appended below:

# Provider Scorecard
## May-09

| PROVIDER NAME | State | Gross Charge/ Patient | RANK |
|---|---|---|---|
| Elston, Scott | NC | $546.74 | 1 |
| Finn, Timothy | NC | $518.95 | 2 |
| Wilkins, Bobbi | NC | $514.68 | 3 |
| Kapoor, Mukesh | VA | $501.71 | 4 |
| Humayun, Dabiruddin | NC | $487.73 | 5 |
| Smith, Jeffery | NC | $487.17 | 6 |
| Hart, David | NC | $486.20 | 7 |
| Rippel, Janet | NC | $469.48 | 8 |
| Guzman, Myra | NC | $464.34 | 9 |
| Dancel, Rex | NC | $463.82 | 10 |
| Figueroa, Lisa | NC | $459.54 | 11 |
| Holt, Rebecca | NC | $454.89 | 12 |
| Carter, Alnissa | NC | $449.55 | 13 |
| Brous, Nancy | NC | $448.67 | 14 |
| Fuzfa, George | AZ | $446.64 | 15 |
| Sicari, Sebastian | VA | $437.95 | 16 |
| Pithwa, Sapna | NC | $434.65 | 17 |
| Floyd, Samuel | NC | $427.84 | 18 |
| Dharmarajan, Deepa | AZ | $426.41 | 19 |
| Nailor, Tracy | GA | $425.95 | 20 |
| Jensen, Beth | VA | $421.50 | 21 |
| Fogarty, Kimberly | VA | $418.80 | 22 |
| Kon, Kevin | AZ | $417.73 | 23 |
| Reid, Carl | NC | $417.02 | 24 |
| Kinght, Trent | AZ | $416.60 | 25 |
| Wilkinson, Larry | AZ | $415.52 | 26 |
| Slaton, Malcolm | CO | $414.90 | 27 |
| Galban, Carlos | NC | $414.79 | 28 |
| Perno, Michelle | NC | $413.91 | 29 |
| Jacquet, Gabrielle | CO | $412.47 | 30 |
| Bowen, Richard | NC | $412.37 | 31 |
| Dancel, Jose | NC | $411.23 | 32 |
| Todd, Timothy | NC | $409.98 | 33 |
| Miranda, Juan | AZ | $407.15 | 34 |
| Babyar, Robert | AZ | $407.08 | 35 |

67.    In addition, NextCare offered free meals and ice cream as a "carrot" to clinic staff and providers if they satisfied their daily allergy testing quota.

68.    The allergy testing quotas and their enforcement by the CEO of the company are direct proof that allergy testing was purely revenue driven rather than medically necessary, as required by law. NextCare's allergy testing quotas led to the following:

- NextCare employees solicited federal program business from patients who did not present clinically significant allergy symptoms, including children and the elderly;
- Thousands of patients who did not need allergy testing were tested;
- Unqualified NextCare medical assistants performed the tests before the patient was seen by a medical provider;
- Patients who initially refused the tests were solicited a second time by the doctor, physician assistant, or nurse practitioner;
- All patients were tested for the same 60 allergens;
- Providers who refused to order/perform these unnecessary tests were fired;
- Providers and clinic staff were provided financial rewards and free meals for performing or approving unnecessary allergy tests; and
- Patients who tested positive for allergies were solicited and prescribed a medicine that is not approved by the FDA.

69.    After two insurance providers for Arizona's Medicaid agency – Maricopa Health Plan and University Family Health Care Plan – stopped reimbursing NextCare for allergy tests, Shufeldt not only continued to set allergy test quotas, he increased pressure because he wanted clinics to perform as many tests as possible before other insurers followed suit and refused to cover allergy testing.

70.    Similarly, Relator was present at a meeting during which Shufeldt discussed how important the allergy testing scheme was to NextCare's future and effectively admitted that he knew billing insurers, including Medicare and other Government Payers, for what amounted to universal allergy screening was unlawful by saying: "If I'm going to go down, it's going to be with a bang."

71.    Using CPT procedure code 95004, Defendants presented or caused to be

22

presented claims to Medicare and other government healthcare programs for reimbursement of $620 for each allergy test performed.

72. As a result, Defendants sought and obtained payment for tens of thousands of allergy tests from Medicare and other Government Payers even though they knew the tests were not reimbursable because they were "not reasonable and necessary for the diagnosis or treatment of illness or injury ...," as required by 42 U.S.C. § 1395y(a)(1)(A) and 42 CFR § 411.15(k).

73. Examples of unnecessary allergy tests that Defendants billed to the Government Payers include:

| Date of Service | Encounter No. | Clinic | Rendering Provider | Government Payer |
|---|---|---|---|---|
| 7-14-09 | 1548164 | Mesa, AZ (Baseline Rd.) | Rylan Chan, PAC | AZ Medicaid |
| 7-14-09 | 1548081 | Chandler, AZ | Karen Blossom, PAC | AZ Medicaid |
| 7-14-09 | 1547833 | Chandler, AZ | David Herrmann, PAC | AZ Medicaid |
| 7-14-09 | 1547991 | Glendale, AZ (Northern Ave.) | Joseph Gaddam, PAC | AZ Medicaid |
| 7-14-09 | 1547710 | Glendale, AZ (Northern Ave.) | Joseph Gaddam, PAC | AZ Medicaid |
| 7-14-09 | 1548552 | Tucson, AZ (Pima St.) | Natalie Camras, FNP | Tricare |
| 7-14-09 | 1547928 | Mesa, AZ (Power Rd.) | Thomas Hartman, PAC | AZ Medicaid |
| 7-14-09 | 1547774 | Mesa, AZ (Power Rd.) | Thomas Hartman, PAC | Medicare |
| 7-14-09 | 23736 | Georgetown, TX (Austin Highway) | Madhuri Madabhushi, MD | Medicare |
| 7-14-09 | 23728 | Georgetown, TX (Austin Highway) | Madhuri Madabhushi, MD | Medicare |
| 7-15-09 | 23805 | Round Rock, TX | Inna Solodky, MD | Medicare |
| 7-16-09 | 1551058 | Phoenix, AZ (Greenway Rd.) | Jeffrey Amato, DO | AZ Medicaid |
| 7-16-09 | 1550241 | Glendale, AZ (59th Ave.) | Lavont Cooper, MD | Medicare |
| 7-16-09 | 1551033 | Glendale, AZ (Northern Ave.) | Joseph Gaddam, PAC | AZ Medicaid |
| 7-16-09 | 1550957 | Apache Junction, AZ | Lynn Devlin, PAC | AZ Medicaid |
| 7-20-09 | 538998 | Goldsboro, NC | Michael Shutak, PAC | Tricare |
| 7-20-09 | 539083 | Lumberton, NC | JD McCallister, MD | Medicare |
| 7-20-09 | 538756 | Wilmington, NC | Diane Harris, DO | Medicare |
| 7-20-09 | 1555378 | Glendale, AZ (59th Ave.) | Susan Stoddard, PAC | AZ Medicaid |
| 7-20-09 | 1555582 | Phoenix, AZ (McDowell Rd.) | Micaela Leighton, MD | AZ Medicaid |

| | | | | |
|---|---|---|---|---|
| 7-20-09 | 1555118 | Phoenix, AZ (McDowell Rd.) | Micaela Leighton, MD | AZ Medicaid |
| 7-20-09 | 24557 | Georgetown, TX (Austin Highway) | Dorian Shevitz, PAC | Medicare |
| 7-21-09 | 439764 | Greeley, CO (10th St.) | Jason Schmidthuber, PAC | CO Medicaid |
| 7-21-09 | 439683 | Aurora, CO (Hampden Ave.) | Jerald Solot, DO | CO Medicaid |
| 7-21-09 | 539940 | Goldsboro, NC | Paul Seward, MD | Tricare |
| 7-21-09 | 539507 | Goldsboro, NC | Paul Seward, MD | Tricare |
| 7-21-09 | 1557055 | Chandler, AZ | Karen Blossom, PAC | AZ Medicaid |
| 7-21-09 | 1556091 | Glendale, AZ (59th Ave.) | Lavont Cooper, MD | AZ Medicaid |
| 7-21-09 | 1555771 | Glendale, AZ (59th Ave.) | Lavont Cooper, MD | AZ Medicaid |
| 7-21-09 | 1556780 | Glendale, AZ (Northern Ave.) | Joseph Gaddam, PAC | Tricare |
| 7-21-09 | 1556030 | Scottsdale, AZ | Steven Fink, PAC | Medicare |
| 7-22-09 | 439993 | Aurora, CO (Hampden Ave.) | Kimberly Shenuk, PAC | Medicare |
| 7-22-09 | 439839 | Aurora, CO (Hampden Ave.) | Jerald Solot, DO | Medicare |
| 7-22-09 | 540387 | Raleigh, NC (Falls Valley Dr.) | Rebecca Holt, PAC | Medicare |
| 7-22-09 | 1558066 | Tempe, AZ | Tennille Allen, FNP | AZ Medicaid |
| 7-23-09 | 440138 | Greeley, CO (10th St.) | Jason Schmidthuber, PAC | CO Medicaid |
| 7-23-09 | 541529 | Burlington, NC | Gregory Smith, PA | Tricare |
| 7-23-09 | 541396 | Lumberton, NC | JD McCallister, MD | Medicare |
| 7-23-09 | 541421 | Raleigh, NC | Timothy Finn, PAC | BCBS-Fed. |
| 7-23-09 | 541549 | Raleigh, NC | Timothy Finn, PAC | BCBS-State |
| 7-23-09 | 1558617 | Chandler, AZ | David Herrmann, PAC | AZ Medicaid |
| 7-23-09 | 1559102 | Chandler, AZ | David Herrmann, PAC | AZ Medicaid |
| 7-23-09 | 1559507 | Chandler, AZ | John Kearney, MD | AZ Medicaid |
| 7-23-09 | 1558920 | Glendale, AZ (59th Ave.) | Lavont Cooper, MD | AZ Medicaid |
| 7-23-09 | 1558822 | Glendale, AZ (59th Ave.) | Lavont Cooper, MD | AZ Medicaid |
| 7-23-09 | 1559136 | Tucson, AZ (Pima St.) | Daniel Williams, DO | AZ Medicaid |
| 7-23-09 | 24806 | Austin, TX (William Cannon Dr.) | Cody Bensten, PAC | Medicare |
| 10-11-09 | 1669257 | Bell, AZ | Kerry Korth, PA | AZ Medicaid |
| 10-11-09 | 1669403 | Bell, AZ | Kerry Korth, PA | AZ Medicaid |
| 10-20-09 | 1684108 | Bell, AZ | George Fuzfa, PAC | Tricare |
| 10-20-09 | 1684423 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 10-20-09 | 1684440 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 10-20-09 | 1684431 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 10-21-09 | 1686740 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 10-21-09 | 1686229 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 10-25-09 | 1692669 | Bell, AZ | Laurie Espinosa, PAC | AZ Medicaid |
| 10-25-09 | 1692675 | Bell, AZ | Laurie Espinosa, PAC | AZ Medicaid |

| 10-25-09 | 1692732 | Bell, AZ | Laurie Espinosa, PAC | Tricare |
| 11-2-09 | 1703750 | Bell, AZ | Warren Downhour, DO | AZ Medicaid |
| 11-3-09 | 1706251 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 11-4-09 | 1708142 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 11-7-09 | 1712471 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 11-7-09 | 1712753 | Bell, AZ | George Fuzfa, PAC | Tricare |
| 11-8-09 | 1713457 | Bell, AZ | George Fuzfa, PAC | Tricare |
| 11-10-09 | 1716483 | Bell, AZ | George Fuzfa, PAC | AZ Medicaid |
| 11-12-09 | 1720017 | Bell, AZ | Trent Knight, PAC | AZ Medicaid |
| 11-16-09 | 1725322 | Bell, AZ | George Fuzfa, PAC | Medicare |
| 11-29-09 | 1744944 | Bell, AZ | Kerry Korth, PA | Medicare |

(On information and belief, the clinics in Lumberton, NC and Bell, AZ recently closed).

74. The above analysis is based on the standards of care in the diagnosis and treatment of allergies, and the application of the "medical necessity" rule to those standards.

75. However, for certain healthcare plans, the standard of care and/or medical necessity of allergy testing have been codified in Local Coverage Determinations (LCD) issued by regional Medicare Administrative Contractors. These LCD's confirmed that Medicare would not cover allergy tests provided to patients who were not previously determined to have clinically significant allergy histories or symptoms that are not controllable by medication or avoidance of the allergen.

76. More particularly, the Medicare Administrative Contractor for Colorado and Texas, TrailBlazer Health Enterprises, LLC, issued LCD L26791 (effective March 1, 2008), which directs as follows with regard to coverage of allergy testing:

> Allergy skin testing is a clinical procedure that is used to evaluate an immunologic response to allergenic material. The need for testing and interpretation of test findings must be correlated with signs and symptoms of possible allergies as determined by a complete history and physical examination of the patient. The number and type of antigens used for testing must be chosen judiciously given the patient's presentation and the tester's clinical judgment.

> Allergy testing is covered when clinically significant allergic history or symptoms that are not controllable by empiric conservative therapy exists. For Medicare to cover allergy testing, the following criteria **must** be met:

- Testing must correlate specifically to the patient's history and physical findings.

* * *

- Allergy testing must be performed on patients whose environment provides the reasonable probability of exposure to the specific antigen tested.

* * *

Contractors shall consider a service to be reasonable and necessary if the contractor determines that the service is:
- Safe and effective.
- Not experimental or investigational (exception: routine costs of qualifying clinical trial services with dates of service on or after September 19, 2000, which meet the requirements of the clinical trials NCD are considered reasonable and necessary).
- Appropriate, including the duration and frequency that is considered appropriate for the service, in terms of whether it is:
  o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member.
  o Furnished in a setting appropriate to the patient's medical needs and condition.
  o Ordered and furnished by qualified personnel.
  o One that meets, but does not exceed, the patient's medical need.
  o At least as beneficial as an existing and available medically appropriate alternative.

77. Earlier LCDs (L24271 and L23658) issued and later retired by Arizona Medicare Administrative Contractor and Colorado Carrier, Noridian Administrative Services, LLC, likewise made clear that Medicare would not cover allergy tests provided to anyone who agreed to have it done, as was the case at NextCare. These retired LCDs provided the following with respect to coverage of allergy tests:

> *Indications and Limitations of Coverage and/or Medical Necessity*
> Allergy sensitivity tests include percutaneous, intradermal, patch, photo patch, mucous membrane, inhalation challenge, ingestion challenge, and in-vitro tests performed and evaluated in correlation with history, physical examination, and other patient observations. These tests are performed to determine body sensitivity and reaction to the antigen for the purpose of diagnosing the presence of allergic reactions to the antigenic stimuli. The number and frequency of tests performed should be judicious and dependent upon the method of testing done as well as the patient's history and physical findings and should be used in conjunction with sound clinical judgment. ... All patients should not necessarily receive the same tests nor the same number of sensitivity tests.

These tests should be performed only when allergy is suspected. Allergy testing is covered when clinically significant allergic symptoms exist and conservative therapy has failed. The testing method chosen must have proven efficacy as a diagnostic tool as demonstrated through scientifically valid medical studies published in peer reviewed journals.

*Percutaneous, Intracutaneous, Photo, Photo Patch and Mucous Membrane tests*: These tests involve the use of small amounts of antigen applied to the superficial layers of the skin or mucous membranes.

To be covered by Medicare, allergy testing must meet the following criteria:
- Testing must be performed based on history and physical exam which suggest IgE mediated disease or delayed hypersensitivity.
- Tested allergens must exist in the patient's environment with a reasonable probability of exposure.

78.     Although it is not necessary to have such a detailed LCD to show that the allergy tests at issue here were not medically necessary, the above-quoted LCDs make it entirely clear that NextCare did not come close to meeting the standard of care for the diagnosis and treatment of patients with allergy symptoms. Thus, the tests were not reimbursable by Medicare and the other Government Payers.

**B.     Medically Unnecessary Spirometry Tests For (Alleged) Allergy Patients**

79.     Spirometry is a test that measures how much air you can inhale and exhale, and how fast you can exhale. Ordinarily, spirometry is used to diagnose serious conditions such as chronic obstructive pulmonary disease (COPD), chronic bronchitis, emphysema, pulmonary fibrosis, asthma and other lung conditions.

80.     In conjunction with its allergy testing initiative, NextCare launched a second initiative to increase patient revenue: performing a spirometry test before every allergy test.

81.     Even though its patients did not require spirometry and there was no clinical basis for performing spirometry as part of an allergy test, NextCare performed the test on every patient who underwent an allergy test.

82. A standing order was issued requiring spirometry testing before every allergy test. This requirement was also set forth in "The Ultimate NextCare Allergy Guide," which was provided to all clinic staff members.

83. Like the allergy tests, medical assistants were ordered to perform this test before the patient was seen by a provider. Here again, to ensure each patient receiving an allergy test also received a spirometry test, NextCare configured its computer system to automatically prompt medical assistants to perform spirometry once an allergy test was "checked-off" on a patient's electronic medical record.

84. NextCare formed a team of medical assistants and had them go to each clinic and provide approximately two hours of spirometry training to the clinics' medical assistants. Even with this limited training, medical assistants lacked the qualifications to administer the spirometry tests.

85. The results of the spirometry tests were added to patients' electronic medical records and were provided to patients when they later met with a provider.

86. Like the allergy tests, the spirometry tests were provided as a screening test, not to make a diagnosis based on clinically significant symptoms − *i.e.*, they were not medically necessary. Accordingly, they were not reimbursable and constituted false claims.

87. In a June 7, 2009 email concerning the spirometry testing initiative that Shufeldt sent to management and employees responsible for reimbursement and billing, the CEO voiced his belief that all employees need to focus on generating more revenue per patient:

> ... [H]ow can we emphasize to our staff that even adding (or saving) $1 per patient makes a huge difference. This mentality, has to be completely inculcated in our culture by continually emphasizing at every employee meeting and during a formal orientation process. ...

88. Also, NextCare knew or should have known Local Coverage Determinations

direct that Medicare does not cover spirometry when it is used to screen for lung conditions. More particularly, Colorado/Texas Medicare Administrative Contractor and Virginia carrier, TrailBlazer Health Enterprises, LLC, issued LCDs L26829 (effective March 1, 2008) and L7809 (effective December 16, 2002), which provided the following guidance with regard to coverage of spirometry:

> The Medicare program specifically excludes screening testing. Examples of screening also include, but are not limited to:
> - An asymptomatic patient, with or without high risk of lung disease.
> - Studies as part of a routine exam.
>
> * * *

89.     Stated another way, despite having no complaints of respiratory problems, patients who visited NextCare clinics were unnecessarily treated with spirometry testing, and the Government Payers paid the bill.

90.     Using CPT procedure code 94010, NextCare billed Medicare and other Government Payers $57 for each spirometry test it conducted prior to an allergy test.

91.     Examples of claims submitted to Government Payers for unnecessary spirometry tests include:

| Date of Service | Encounter No. | Clinic | Rendering Provider | Government Payer |
|---|---|---|---|---|
| 10-11-09 | 1669257 | Bell, AZ | Kerry Korth, PA | AZ Medicaid |
| 11-10-09 | 1716483 | Bell, AZ | Trent Knight, PAC | AZ Medicaid |
| 11-12-09 | 1720017 | Bell, AZ | Trent Knight, PAC | AZ Medicaid |
| 11-16-09 | 1725322 | Bell, AZ | George Fuzfa, PAC | Medicare |

92.     Submitting claims to Government Payers which are not reimbursable, or which are essentially worthless, violates the FCA and State FCAs.

C.     **Medically Unnecessary Diatherix Respiratory Infections Panel/H1N1 Tests**

93.     On or about September 2009, NextCare launched a third testing initiative to increase patient revenue: performing an entire battery of respiratory infection tests on all patients

29

with cold or flu-like symptoms. Defendants performed these unnecessary tests through at least April 2010.

94.     NextCare had a standing order requiring all clinics to provide a whole battery of respiratory infection tests to anyone with cold or flu-like symptoms. Frequently, NextCare providers administered the test without obtaining informed consent from the patient. As part of their evaluation of patients with cold or flu-like symptoms, NextCare providers took a nasal swab from each patient. The nasal swabs were sent by Federal Express to Diatherix Laboratories in Huntsville, Alabama for testing. For every patient NextCare, ordered Diatherix's Respiratory Infections Panel, which consisted of each of the following viral and bacterial infections:

> VIRAL INFECTIONS:
> Adenovirus;
> Coxsackievirus/Echovirus;
> Human Metapneumovirus;
> Influenza A – Human Influenza;
> Influenza A – H1N1-09;
> Influenza B;
> Parainfluenza;
> Respiratory Syncytial Virus A;
> Respiratory Syncytial Virus B; and
> Rhinovirus
> BACTERIAL INFECTIONS:
> Acinetobacter baumannii;
> Chlamydia pneumoniae;
> Haemophilus influenza;
> Klebsiella pneumoniae;
> Legionella pneumophila;
> Mycoplasma pneumonia;
> Neisseria meningitides;
> Pseudomonas aeruginosa;
> Staphylococcus aureus;
> Methicillin resistant staphylococcus aureus ("MRSA");
> Streptococcus pneumonia; and
> Streptococcus group A

95.     Using CPT Code 87798 NextCare billed the Government Payers $75 per test for each of the tests in the Diatherix Respiratory Infections Panel test except for Chlamydia

pneumoniae (CPT Code 87486), legionella pneumophila (CPT Code 87541), mycoplasma pneumonia (CPT Code 87581), staphylococcus aureus (CPT Code 87640), MRSA (CPT Code 87641), and streptococcus group A (CPT Code 87651). For each of those six tests, NextCare billed the Government Payers $55. In total, for the entire battery of 22 tests NextCare billed the Government Payers $1,530 per patient.

96.    NextCare's universal testing for all of the various respiratory infections was not in compliance with professional standards of care. NextCare did not order this broad variety of tests because they were medically necessary; rather it ordered them because they generated revenue.

97.    As with the allergy testing, NextCare assigned a daily Diatherix Respiratory Infections Panel testing quota to each clinic. The photograph below, which was taken at NextCare's Glendale/Peoria, Arizona clinic in or around December 2009, reflects that the clinic had a daily quota of ten Diatherix tests ("DX") along with a daily quota of seven allergy tests:



98.     Moreover, NextCare used concerns surrounding the H1N1 influenza virus, which were well-publicized at the time, as a basis for pushing providers to order the Respiratory Infections Panel for all patients with cold or flu-symptoms. However, Diatherix's Respiratory Infections Panel, which tested for many other infections in addition to H1N1 influenza, was not a reasonable and necessary method of treating patients that came to NextCare's clinics with complaints of flu-like symptoms.

99.     According to the Centers for Disease Control and Prevention (CDC), 99% of the influenza viruses circulating in the United States during the 2009 flu season were H1N1 influenza. See Interim Recommendations for Clinical Use of Influenza Diagnostic Tests During the 2009-10 Influenza Season, Centers for Disease Control and Prevention, Sep. 29, 2009, http://www.cdc.gov/h1n1flu/guidance/diagnostic_tests.htm. Thus, nearly all Americans that had the flu during the 2009-2010 flu season had the H1N1 influenza virus.

100.    Mindful of this fact, the CDC provided the following guidance regarding the use of influenza diagnostic testing on outpatients during the 2009-2010 flu season:

> Once influenza activity has been documented in a community or geographic area, most patients with an uncomplicated illness consistent with influenza can be diagnosed clinically and do not require influenza testing for clinical management, including antiviral treatment decisions.
>
> In certain situations, influenza diagnostic testing of patients who are not severely ill may help inform decisions regarding clinical care, infection control, or management of close contacts. Clinicians should use their clinical judgment in these situations to decide when to test for influenza in patients who are not severely ill....

Id.

101.    Since 99% of flu cases in the United States were H1N1, testing for H1N1 was not necessary for most people with flu symptoms because the test results normally would not change how the person was treated. The CDC confirmed this reasoning in the following Questions &

32

Answers it issued to the public on September 29, 2009:

<u>How will I know if I have the flu this season?</u>
You may have the flu if you have one or more of these symptoms: fever, cough, sore throat, runny or stuffy nose, body aches, headache, chills, fatigue and sometimes, diarrhea and vomiting. Most people with 2009 H1N1 have had mild illness and have not needed medical care or antiviral drugs, and the same is true of seasonal flu. (More information is available on *What To Do If You Get Sick* this flu season.) **Most people with flu symptoms do not need a test for 2009 H1N1 because the test results usually do not change how you are treated.**

<u>How can I know for certain if I have the flu this season?</u>
To know for certain, a test specific for flu would need to be performed. **But most people with flu symptoms do not need a test for 2009 H1N1 flu because the test results usually do not change how you are treated.**
* * *
<u>Will my health care provider test me for flu if I have flu-like symptoms?</u>
Not necessarily. Your health care provider may diagnose you with flu based on your symptoms and their clinical judgment or they may choose to use an influenza diagnostic test. Depending on their clinical judgment and your symptoms, your healthcare provider will decide whether testing is needed and what type of test to perform. CDC has provided recommendations for clinicians this season to help with testing decisions. **This season, most testing will be done in people who are seriously ill (hospitalized patients) and patients where testing may impact treatment decisions. In most cases, if a healthcare provider suspects you have the flu, the test results will not change their treatment decisions.**

<u>Who is being tested for flu this season?</u>
This season CDC has provided *Interim Recommendations for Clinical Use of Influenza Diagnostic Tests During the 2009-10 Influenza Season* which recommends that the following people receive influenza diagnostic testing: 1) people who are hospitalized with suspected flu and 2) people such as pregnant women or people with weakened immune systems, for whom a diagnosis of flu will help their doctor make decisions about their care. **CDC expects that most people with flu symptoms this season will not require testing for 2009 H1N1 because the test results usually do not change how you are treated.** Additional people may be recommended for testing based on the clinical judgment of their health care provider.

<u>How will I know what strain of flu I have or if it's 2009 H1N1 (formerly known as Swine Flu)?</u>
You may not be able to find out definitively what flu virus you have. Currently available rapid influenza diagnostic tests cannot distinguish between 2009 H1N1 and seasonal influenza A viruses. **Most people with flu symptoms this season**

will not require testing for 2009 H1N1 because the test results usually do not change how you are treated. As of September 2009, more than 99% of circulating influenza viruses in the United States are 2009 H1N1. Therefore, at this time, if your health care provider determines that you have the flu, you most likely have 2009 H1N1. As the season progresses, different influenza viruses may circulate and updated national information on circulating influenza viruses is available in the *FluView U.S. Weekly Influenza Surveillance*.

There are laboratory tests available that can tell the difference between 2009 H1N1 and other strains of flu, but these can take one to several days to provide results and this season, CDC has recommended that this testing be focused on 1) people who are hospitalized with suspected flu; 2) people such as pregnant women or people with weakened immune systems, for whom a diagnosis of flu will help their doctor make decisions about their care.

Influenza Diagnostic Testing During the 2009-2010 Flu Season, Centers for Disease Control and Prevention, Sep. 29, 2009, http://www.cdc.gov/h1n1flu/diagnostic_testing_public_qa.htm.

102.    And since the culture had to be shipped to Diatherix in Alabama, the earliest NextCare would receive the results was the next day, but typically it was two days before NextCare received the results and could report them to patients. Since the patient would have already been started on a treatment regimen designed as though they had the H1N1 influenza virus, test results received one or two days later provided no diagnostic benefit.

103.    Moreover, as a result of inadequate controls, NextCare frequently failed to notify patients of the test results, or took several days to notify them.

104.    Notably, after implementation of the Diatherix initiative, Shufeldt and NextCare's Regional Medical Directors directed clinic managers to remove the cheaper rapid flu tests from clinics' shelves so providers would only use the more profitable Diatherix test.

105.    Like allergy testing and spirometry, Shufeldt viewed Diatherix testing as a money-making opportunity and pressured staff to administer the test. In responding to a October 6, 2009 email from Clinic Manager, Dean Maniscalco, outlining clinic staffing issues, such as "lack of provider buy-in and support" and "juggl[ing] multiple time-consuming initiatives

(Allergy, Diatherix, ...)," Shufeldt wrote:

> Dean did a nice job of summarizing some of the challenges faced by staff in clinics. Although I appreciate these challenges, understand that McDowell, our busiest clinic has not seen a drop off in either allergy or Diatherix. In fact yesterday, McDowell did 13 allergy tests and saw over 100 patients.

> We cannot afford to let any of these challenges blunt our ability to continue this important initiative. It is your responsibility to ensure that all of the obstacles are eliminated and that any provider-driven barriers are identified and dealt with.

> I realize that most of the managers are preaching the same message; however, I don't believe that each manager is truly holding their staff accountable to the expected performance since the same clinics, week after week, are not performing to expectations. To date we have never hit, not even for one day, the expected number of allergy tests. How can we preach excellence in operations and be ok with this?

Here again, doctors who were not willing to recommend a medically unnecessary test were seen as "barriers" to be "identified and dealt with" – *i.e.*, reprimanded or fired. And Shufeldt was again threatening his managers, saying he did not believe they are "truly holding their staff accountable to the expected performance since the same clinics, week after week, are not performing to expectations."

106. Examples of claims involving unnecessary and/or worthless Diatherix Respiratory Infections Panel tests that were billed to the Government Payers include:

| Date | Encounter No. | Clinic | Provider | Payer |
|---|---|---|---|---|
| 10-11-09 | 1669257 | Bell, AZ | Kerry Korth, PA | AZ Medicaid |
| 10-11-09 | 1669269 | Bell, AZ | Kerry Korth, PA | AZ Medicaid |
| 10-11-09 | 1669403 | Bell, AZ | Kerry Korth, PA | AZ Medicaid |
| 10-25-09 | 1692192 | Bell, AZ | Laurie Espinosa, PAC | AZ Medicaid |
| 10-25-09 | 1692732 | Bell, AZ | Laurie Espinosa, PAC | Tricare |
| 11-01-09 | 1702489 | Bell, AZ | Trent Knight, PAC | AZ Medicaid |
| 11-5-09 | 1708734 | Bell, AZ | Kerry Korth, PA | AZ Medicaid |
| 11-12-09 | 1720017 | Bell, AZ | Trent Knight, PAC | AZ Medicaid |
| 11-12-09 | 1720412 | Bell, AZ | Trent Knight, PAC | Tricare |
| 11-12-09 | 1219029 | Glendale, AZ (59th Ave.) | Lavont Cooper, MD | AZ Medicaid |

107. Many patients, including the five shaded cases in the above chart, received both

the allergy test (for all 62 allergens) and the complete Diatherix Respiratory Infections Panel. This further evidences that the allergy tests and Diatherix tests were not medically necessary and instead were performed indiscriminately.

108. On a related note, because Arizona's Medicaid agency, AHCCCS, reimbursed for the Diatherix Respiratory infections Panel test claims submitted by NextCare at a lower amount than it did if the claims were submitted by Diatherix, NextCare and Diatherix worked out a financial arrangement under which ***Diatherix billed*** AHCCCS for the Respiratory Infections Panel tests that ***NextCare performed*** on AHCCCS beneficiaries. After receiving payment, Diatherix credited part of the amount to NextCare's account.

109. In or around March 2010, Diatherix's billing office asked the manager of NextCare's Surprise, Arizona clinic (a clinic Relator supervised as an Area Operations Manager) to re-open charts of patients that received Diatherix tests and change the diagnosis coding so AHCCCS would cover the claim or reimburse at a higher amount. NextCare terminated Relator after he voiced his objection to re-opening charts and changing coding to NextCare's Vice President of Operations, Dale Thompson. On information and belief, the charts were subsequently altered to allow Diatherix to re-bill the tests to AHCCCS.

## VI. COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)-(B)
### Against All Defendants
### For Medically Unnecessary Allergy Tests

110. Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

111. Throughout the relevant time period, Defendants knowingly performed, or caused

36

to be performed, allergy tests that were medically unnecessary and essentially worthless. Defendants submitted claims, or caused claims to be submitted, for these allergy tests that were not reimbursable by Medicare, Medicaid and other federal healthcare programs. Through these acts, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States in violation of § 3729(a)(1)(A) of the FCA. Such claims caused actual damages to the United States.

112.    Further, throughout the relevant time period, Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the allergy tests were medically necessary – in order to obtain reimbursement from Medicare, Medicaid and other federal healthcare programs. Through these acts, Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to the United States, in violation of § 3729(a)(1)(B) of the FCA. Such claims caused actual damages to the United States.

**Count II**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)-(B)**
**Against All Defendants**
**For Medically Unnecessary Spirometry Tests**

113.    Relator re-alleges and incorporates all of the proceeding paragraphs as if fully set forth herein and further alleges as follows:

114.    Throughout the relevant time period, Defendants knowingly performed, or caused to be performed, spirometry tests that were medically unnecessary and essentially worthless. Defendants submitted claims, or caused claims to be submitted, for performing spirometry tests that were not reimbursable by Medicare, Medicaid and other federal healthcare programs. Through these acts, Defendants knowingly presented, or caused to be presented, false or

fraudulent claims for payment to the United States in violation of § 3729(a)(1)(A) of the FCA. Such claims caused actual damages to the United States.

115.    Further, throughout the relevant time period, Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the spirometry tests were medically necessary – in order to obtain reimbursement from Medicare, Medicaid and other federal healthcare programs. Through these acts, Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to the United States, in violation of § 3729(a)(1)(B) of the FCA. Such claims caused actual damages to the United States.

**Count III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)-(B)**
**Against All Defendants**
**For Medically Unnecessary Diatherix Respiratory Infections Panel/H1N1 Tests**

116.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

117.    Throughout the relevant time period, Defendants knowingly performed, or caused to be performed, Diatherix Respiratory Infections Panel/H1N1 tests that were medically unnecessary and essentially worthless. Defendants submitted claims, or caused claims to be submitted, for performing Diatherix Respiratory Infections Panel/H1N1 tests that were not reimbursable by Medicare, Medicaid and other federal healthcare programs. Through these acts, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States in violation of § 3729(a)(1)(A) of the FCA. Such claims caused actual damages to the United States.

118.    Further, throughout the relevant time period, Defendants made or used, or caused

the making or use of, false records or statements – including express or implied certifications that

the Diatherix Respiratory Infections Panel/H1N1 tests were medically necessary – in order to

obtain reimbursement from Medicare, Medicaid and other federal healthcare programs. Through

these acts, Defendants knowingly made or used, or caused the making or use of, false records or

statements material to false or fraudulent claims to the United States, in violation of §

3729(a)(1)(B) of the FCA. Such claims caused actual damages to the United States.

**<u>Count IV</u>**
**Colorado Medicaid False Claims Act**
**C.R.S. 25.5-4-305(1)(a)-(b)**
**Against NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Allergy Tests**

119.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set

forth herein and further alleges as follows:

120.    Throughout the relevant time period, NextCare, Inc., Colorado Urgent Care, LLC,

John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, allergy

tests that were medically unnecessary and essentially worthless. NextCare, Inc., Colorado Urgent

Care, LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be

submitted, for performing allergy tests that were not reimbursable by Medicaid and other state

healthcare programs. Through these acts, NextCare, Inc., Colorado Urgent Care, LLC, John

Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or

fraudulent claims for payment to Colorado in violation of § 25.5-4-305(1)(a) of the Colorado

Medicaid False Claims Act. Such claims caused actual damages to Colorado.

121.    Further, throughout the relevant time period, NextCare, Inc., Colorado Urgent

Care, LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of,

false records or statements – including express or implied certifications that the allergy tests were

39

medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Colorado, in violation of § 25.5-4-305(1)(b) of the Colorado Medicaid False Claims Act. Such claims caused actual damages to Colorado.

### Count V
**Colorado Medicaid False Claims Act**
**C.R.S. 25.5-4-305(1)(a)-(b)**
**Against NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Spirometry Tests**

122.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

123.    Throughout the relevant time period, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, spirometry tests that were medically unnecessary. NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing spirometry tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Colorado in violation of § 25.5-4-305(1)(a) of the Colorado Medicaid False Claims Act. Such claims caused actual damages to Colorado.

124.    Further, throughout the relevant time period, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the spirometry tests were medically necessary – in order to obtain reimbursement from Medicaid and other state

healthcare programs. Through these acts, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Colorado, in violation of § 25.5-4-305(1)(b) of the Colorado Medicaid False Claims Act. Such claims caused actual damages to Colorado.

**Count VI**
**Colorado Medicaid False Claims Act**
**C.R.S. 25.5-4-305(1)(a)-(b)**
**Against NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Diatherix Respiratory Infections Panel/H1N1 Tests**

125.     Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

126.     Throughout the relevant time period, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, Diatherix Respiratory Infections Panel/H1N1 tests that were medically unnecessary. NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing Diatherix Respiratory Infections Panel/H1N1 tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Colorado in violation of § 25.5-4-305(1)(a) of the Colorado Medicaid False Claims Act. Such claims caused actual damages to Colorado.

127.     Further, throughout the relevant time period, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the Diatherix

Respiratory Infections Panel/H1N1 tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Colorado Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Colorado, in violation of § 25.5-4-305(1)(b) of the Colorado Medicaid False Claims Act. Such claims caused actual damages to Colorado.

**Count VII**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. § 49-4-168.1(a)(1)-(2)**
**Against NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Allergy Tests**

128.     Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

129.     Throughout the relevant time period, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, allergy tests that were medically unnecessary. NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing allergy tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Georgia in violation of § 49-4-168.1(a)(1) of the Georgia False Medicaid Claims Act. Such claims caused actual damages to Georgia.

130.     Further, throughout the relevant time period, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the allergy tests were

medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Georgia, in violation of § 49-4-168.1(a)(2) of the Georgia False Medicaid Claims Act. Such claims caused actual damages to Georgia.

**Count VIII**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. § 49-4-168.1(a)(1)-(2)**
**Against NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Spirometry Tests**

131.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

132.    Throughout the relevant time period, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, spirometry tests that were medically unnecessary. NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing spirometry tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Georgia in violation of § 49-4-168.1(a)(1) of the Georgia False Medicaid Claims Act. Such claims caused actual damages to Georgia.

133.    Further, throughout the relevant time period, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the spirometry tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare

programs. Through these acts, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Georgia, in violation of § 49-4-168.1(a)(2) of the Georgia False Medicaid Claims Act. Such claims caused actual damages to Georgia.

**Count IX**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. § 49-4-168.1(a)(1)-(2)**
**Against NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Diatherix Respiratory Infections Panel/H1N1 Tests**

134.   Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

135.   Throughout the relevant time period, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, Diatherix Respiratory Infections Panel/H1N1 tests that were medically unnecessary. NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing Diatherix Respiratory Infections Panel/H1N1 tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Georgia in violation of Section 49-4-168.1(a)(1) of the Georgia False Medicaid Claims Act. Such claims caused actual damages to Georgia.

136.   Further, throughout the relevant time period, NextCare, Inc., NextCare Georgia LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the Diatherix Respiratory Infections Panel/H1N1 tests were medically necessary – in order to obtain reimbursement from

Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Georgia LLC, and John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Georgia, in violation of § 49-4-168.1(a)(2) of the Georgia False Medicaid Claims Act. Such claims caused actual damages to Georgia.

**Count X**
**North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-607(A)(1)-(2)**
**Against NextCare, Inc., NextCare North Carolina LLC,**
**Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Allergy Tests**

137. Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

138. Throughout the relevant time period, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, allergy tests that were medically unnecessary. NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing allergy tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to North Carolina in violation of § 1-607(A)(1) of the North Carolina False Claims Act. Such claims caused actual damages to North Carolina.

139. Further, throughout the relevant time period, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied

certifications that the allergy tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to North Carolina, in violation of § 1-607(A)(2) of the North Carolina False Claims Act. Such claims caused actual damages to North Carolina.

**Count XI**
**North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-607(A)(1)-(2)**
**Against NextCare, Inc., NextCare North Carolina LLC,**
**Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Spirometry Tests**

140. Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

141. Throughout the relevant time period, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, spirometry tests that were medically unnecessary. NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing spirometry tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to North Carolina in violation of § 1-607(A)(1) of the North Carolina False Claims Act. Such claims caused actual damages to North Carolina.

142. Further, throughout the relevant time period, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants made or

used, or caused the making or use of, false records or statements – including express or implied certifications that the spirometry tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to North Carolina, in violation of § 1-607(A)(2) of the North Carolina False Claims Act. Such claims caused actual damages to North Carolina.

### Count XII
### North Carolina False Claims Act
### N.C. Gen. Stat. § 1-607(A)(1)-(2)
### Against NextCare, Inc., NextCare North Carolina LLC,
### Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants
### For Medically Unnecessary Diatherix Respiratory Infections Panel/H1N1 Tests

143.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

144.    Throughout the relevant time period, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, Diatherix Respiratory Infections Panel/H1N1 tests that were medically unnecessary. NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing Diatherix Respiratory Infections Panel/H1N1 tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to North Carolina in violation of § 1-607(A)(1) of the North Carolina False Claims Act. Such claims caused actual damages to North Carolina.

47

145.   Further, throughout the relevant time period, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the Diatherix Respiratory Infections Panel/H1N1 tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare North Carolina LLC, Matrix Occupational Health, Inc., John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to North Carolina, in violation of § 1-607(A)(2) of the North Carolina False Claims Act. Such claims caused actual damages to North Carolina.

## Count XIII
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code §§ 36.002(1), (4)(B) & (7)
### Against NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants
### For Medically Unnecessary Allergy Tests

146.   Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

147.   Throughout the relevant time period, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, allergy tests that were medically unnecessary. NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing allergy tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Texas in violation of §§ 36.002(1) and (7) of the Texas Medicaid Fraud Prevention Act. Such claims caused actual

damages to Texas.

148.    Further, throughout the relevant time period, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the allergy tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Texas, in violation of § 36.002(4)(B) of the Texas Medicaid Fraud Prevention Act. Such claims caused actual damages to Texas.

<u>Count XIV</u>
**Texas Medicaid Fraud Prevention Act**
**Tex. Hum. Res. Code §§ 36.002(1), (4)(B) & (7)**
**Against NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Spirometry Tests**

149.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

150.    Throughout the relevant time period, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, spirometry tests that were medically unnecessary. NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing spirometry tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Texas in violation of §§ 36.002(1) and (7) of the Texas Medicaid Fraud Prevention Act. Such claims caused actual damages to Texas.

151.    Further, throughout the relevant time period, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the spirometry tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Texas, in violation of § 36.002(4)(B) of the Texas Medicaid Fraud Prevention Act. Such claims caused actual damages to Texas.

**Count XV**
**Texas Medicaid Fraud Prevention Act**
**Tex. Hum. Res. Code §§ 36.002(1), (4)(B) & (7)**
**Against NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Diatherix Respiratory Infections Panel/H1N1 Tests**

152.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

153.    Throughout the relevant time period, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, Diatherix Respiratory Infections Panel/H1N1 tests that were medically unnecessary. NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing Diatherix Respiratory Infections Panel/H1N1 tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Texas in violation of §§ 36.002(1) and (7) of the Texas Medicaid Fraud Prevention Act. Such claims caused actual damages to Texas.

154.    Further, throughout the relevant time period, NextCare, Inc., NextCare Texas

LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the Diatherix Respiratory Infections Panel/H1N1 tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., NextCare Texas LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Texas, in violation of § 36.002(4)(B) of the Texas Medicaid Fraud Prevention Act. Such claims caused actual damages to Texas.

### Count XVI
**Virginia Fraud Against Taxpayers Act**
**Va. Code §§ 8.01-216.3a(1)-(2)**
**Against NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Allergy Tests**

155.     Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

156.     Throughout the relevant time period, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, allergy tests that were medically unnecessary. NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing allergy tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Virginia in violation of § 8.01-216.3a(1) of the Virginia Fraud Against Taxpayers Act. Such claims caused actual damages to Virginia.

157.     Further, throughout the relevant time period, NextCare, Inc., Virginia Urgent

51

Care, LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the allergy tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Virginia, in violation of § 8.01-216.3a(2) of the Virginia Fraud Against Taxpayers Act. Such claims caused actual damages to Virginia.

### Count XVII
**Virginia Fraud Against Taxpayers Act**
**Va. Code §§ 8.01-216.3a(1)-(2)**
**Against NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Spirometry Tests**

158.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

159.    Throughout the relevant time period, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, spirometry tests that were medically unnecessary. NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing spirometry tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Virginia in violation of § 8.01-216.3a(1) of the Virginia Fraud Against Taxpayers Act. Such claims caused actual damages to Virginia.

160.    Further, throughout the relevant time period, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of,

false records or statements – including express or implied certifications that the spirometry tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Virginia, in violation of § 8.01-216.3a(2) of the Virginia Fraud Against Taxpayers Act. Such claims caused actual damages to Virginia.

**Count XVIII**
**Virginia Fraud Against Taxpayers Act**
**Va. Code §§ 8.01-216.3a(1)-(2)**
**Against NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants**
**For Medically Unnecessary Diatherix Respiratory Infections Panel/H1N1 Tests**

161.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further alleges as follows:

162.    Throughout the relevant time period, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly performed, or caused to be performed, Diatherix Respiratory Infections Panel/H1N1 tests that were medically unnecessary. NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants submitted claims, or caused claims to be submitted, for performing Diatherix Respiratory Infections Panel/H1N1 tests that were not reimbursable by Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to Virginia in violation of § 8.01-216.3a(1) of the Virginia Fraud Against Taxpayers Act. Such claims caused actual damages to Virginia.

163.    Further, throughout the relevant time period, NextCare, Inc., Virginia Urgent

Care, LLC, John Shufeldt, and Doe Defendants made or used, or caused the making or use of, false records or statements – including express or implied certifications that the Diatherix Respiratory Infections Panel/H1N1 tests were medically necessary – in order to obtain reimbursement from Medicaid and other state healthcare programs. Through these acts, NextCare, Inc., Virginia Urgent Care, LLC, John Shufeldt, and Doe Defendants knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to Virginia, in violation of § 8.01-216.3a(2) of the Virginia Fraud Against Taxpayers Act. Such claims caused actual damages to Virginia.

## VII. <u>REQUESTS FOR RELIEF</u>

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in his favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

This Request also includes, with respect to the State statutes cited above, the maximum damages permitted by those statutes and the maximum fine or penalty permitted by those statutes, and any other recoveries or relief provided for under the State FCAs.

Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## VIII.  DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: September 1, 2011

Respectfully submitted,

MARSHALL, ROTH & GREGORY, P.C.

Clifford C. Marshall, Jr.
(NC State Bar No.10418)
P.O. Box 769
Asheville, NC 28802
cmarshall@mrglawfirm.com
(828) 281-2100
Fax (828) 281-2120

Daniel R. Miller
(PA State Bar No.68141)
Casey M. Preston
(PA State Bar No.86508)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
dmiller@bm.net
cpreston@bm.net
(215) 875-3000
Fax (215) 875-4636

*Attorneys for the Relator*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a copy of the above Amended Complaint to be served on the following counsel by electronic mail:

| | |
|---|---|
| Jennifer A. Stalzer<br>Trial Attorney<br>U.S. Department of Justice, Civil Fraud Section<br>Patrick Henry Building<br>601 D Street, NW<br>Room 9607<br>Washington, DC 20004<br>jennifer.a.stalzer@usdoj.gov | Clark C. Walton<br>Assistant Attorney General<br>Medicaid investigation Unit<br>State of North Carolina<br>Department of Justice<br>11925 Sam Roper Drive, Ste. A<br>Charlotte, NC 28269<br>cwalton@ncdoj.gov |
| Donald H. Caldwell, Jr.<br>Assistant United States Attorney<br>The U.S. Attorney's Office<br>Western District of North Carolina<br>227 West Trade Street, Suite 1650<br>Charlotte, NC 28202<br>Donald.H.Caldwell@usdoj.gov | Susan J. Miller<br>Assistant Attorney General<br>Civil Medicaid Fraud Division<br>Office of the Attorney General of Texas<br>P.O. Box 12548<br>Austin, TX 78711-2548<br>susan.miller@oag.state.tx.us |
| George A. Codding<br>Colorado MFCU<br>Office of the Attorney General<br>1525 Sherman St., 7th Floor<br>Denver, CO 80203<br>george.codding@state.co.us | Elizabeth Fitzgerald<br>Assistant Attorney General<br>Medicaid Fraud Control Unit,<br>Civil Investigations Squad<br>Virginia Attorney General's Office<br>900 East Main Street<br>Richmond, Virginia 23219<br>efitzgerald@oag.state.va.us |
| Nancy B. Allstrom<br>Senior Assistant Attorney General<br>Georgia Medicaid Fraud Control Unit<br>2100 E. Exchange Pl.<br>Bldg. One, Ste. 200<br>Tucker, Georgia 30084<br>nancy.allstrom@mfcu.ga.gov | |

DATED: September 1, 2011

Casey M. Preston